**U.S. DISTRICT COURT FOR THE DISTRICT OF IDAHO**

QUALITY RESOURCE & SERVICES, INC.,
a Washington Corporation,

                 Plaintiff,

vs.

IDAHO POWER COMPANY, an Idaho
Corporation; DOES 1-5; and ABC
CORPORATIONS 1-5.

                 Defendant.
_____

Case No. CV08-145-S-EJL

**MEMORANDUM DECISION
AND ORDER**

Pending before the Court are Plaintiff Quality Resource & Services's (QRS) Motion for Summary Judgment (Docket No. 41) and Defendant Idaho Power Company's (IPC) Cross-Motion for Summary Judgment (Docket No. 42). The Court DENIES QRS's Motion for Summary Judgment and GRANTS IPC's Motion for Summary Judgment on all counts.

## I. FACTUAL BACKGROUND

QRS is a company based in Washington State that provides temporary skilled labor, primarily to the utility industry. *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 3 (Docket No. 41-2). QRS temporary workers are at-will employees. *Id.* at p. 20; *see also First Amended Complaint and Demand for Jury Trial*, ¶ 51 (Docket No. 38). IPC is an electrical utility company based in Idaho. *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 4 (Docket No. 41-2).

On July 19, 2006, QRS entered into a contract (the Contract) with IPC in which, for a period of three years, QRS agreed to "recruit, interview, select and hire applicants" who were "best qualified to perform the type of Work described in Exhibit A," and to provide those

temporary workers to IPC "on an as-needed basis." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Art. 1, Exh. A, and Art. 4 (Docket No. 42-5). In turn, IPC agreed to pay QRS "at the rate(s) set forth on Exhibit A" if and when IPC hired QRS workers. *Id.* at Art. 5. Pursuant to the Contract, QRS supplied several QRS workers to IPC. *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 5 (Docket No. 41-2).

The Contract established that QRS was an independent contractor and that QRS workers assigned to IPC were "solely the employees of [QRS]." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Arts. 2–3 (Docket No. 42-5). Additionally, IPC "retain[ed] the right to hire its own employees directly without payment or obligation to [QRS]." *Id.* at Art. 3. Article 1(7) of the Contract provided that IPC could terminate a QRS worker "for any valid legal reason." *Id.* at Art. 1(7). The Contract also contained a merger clause, *id.* at Art. 22, and provided that it was governed by "the laws of the State of Idaho," *id.* at Art. 19. Finally, Article 17 of the Contract provided that IPC "may, at its option, terminate this Agreement in whole or in part any time by written notice thereof to [QRS] . . . ." *Id.* at Art. 17. QRS never received written notice that IPC planned to terminate its contract with QRS. *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 15 (Docket No. 41-2).

In early 2007, IPC began its "Supply Chain Strategic Sourcing Initiative," the goal of which was to, among other objectives, reduce the costs of IPC's use of outside suppliers of temporary labor. *Id.* at p. 6. To assist in the planning and implementation of IPC's transition to a single-source provider of temporary labor, IPC hired a consulting firm, Denali. *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. D,

*Deposition of Angelique Keavney*, pp. 16:5–17:18:18 (Docket No. 42-7). IPC's primary contact with Denali was through Alpar Kamber, a Denali employee. *Id.* at pp. 17:16–18:6. The sub-committee assigned to deal with IPC's use of temporary labor was called the Strategic Sourcing Staff Augmentation Team (the SSSAT). *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 15 (Docket No. 41-2) One stated goal of the SSSAT was to "[b]uild a comprehensive RFP [Request for Proposal] to select the best vendor(s) [i.e., supplier(s) of temporary labor]." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. E at p. 3 (Docket No. 42-8).

In February 2007, the SSSAT sent a "Request for Information" (RFI) to each of IPC's current suppliers of temporary labor, including QRS. *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, pp. 7, 9 (Docket No. 41-2). The RFI stated, in part, that "[a]ll information provided . . . will be used solely for the purpose of understanding the current state of Idaho Power's temporary staffing program." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. L at p. 2 (Docket No. 42-15). The RFI required suppliers of temporary labor to submit electronic workbooks that contained detailed requests for information relating to the suppliers' workers at IPC—particularly, who those workers were and the type and duration of work they performed at IPC. *Id.* at p. 3; *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 9 (Docket No. 41-2). The electronic workbook also asked detailed questions regarding suppliers' business capabilities and pricing. *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 9 (Docket No. 41-2). Temporary labor suppliers were required to complete the RFI "[i]n order to be eligible for the future RFP process." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. L at p. 3 (Docket No. 42-15).

QRS responded to the RFI on February 27, 2007.  *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 9 (Docket No. 41-2).  Suppliers' responses to the RFIs were analyzed in a report called the "Temporary Staffing Category Profile & Sourcing Strategy" (the Report).  *Declaration of John L. Runft in Support of Plaintiff's Motion for Summary Judgment*, Exh. K (Docket No. 41-5, SEALED).  According to the Report, QRS received the lowest score of all respondents and was not chosen to participate in the RFP process.  *Id.* at p. 18.  However, the Report indicates that "QRS will continue to be utilized for niche work if needed."  *Id.*  At the conclusion of the RFP process, on about May 23, 2007, IPC selected Spherion to be IPC's primary supplier of temporary labor.  *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 12 (Docket No. 41-2).

On June 14, 2007, all IPC temporary workers, including QRS workers, received a memorandum (the Memorandum), or were orally informed of the information contained in the Memorandum, informing them of IPC's transition to Spherion.  *Id.* at p. 15; *see also Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. G (Docket No. 42-10) (the Memorandum).  The Memorandum stated that if a temporary worker's current assignment was scheduled to end after July 9, 2007, that worker had two options: (1) the worker could either "[c]ontinue with [his] existing employer to be re-assigned to service another client," or (2) the worker could "[a]pply with Spherion for consideration at IPC . . . ."  *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. G (Docket No. 42-10).  Neither IPC nor Spherion contacted QRS before the Memorandum was given to QRS workers.  *Statement of David Ingram*, p. 2 (Docket No. 41-3).

QRS first learned of the Memorandum on or about June 21, 2007 when a QRS worker at IPC contacted QRS about the notice.  *Id.* at p. 3.  On or about June 22, 2007, QRS contacted IPC

and spoke with Dave Welch about the Memorandum. *Id.* In a subsequent discussion with IPC, which occurred in late June 2007, QRS was informed by IPC managers that QRS workers would be dismissed on August 17, 2007, unless the workers joined Spherion. *Id.* Between June 14, 2006 and August 17, 2007, six workers left QRS and joined Spherion and continued to work at IPC as Spherion employees after August 17, 2007. *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 16 (Docket No. 41-2). Four QRS workers continued to work at IPC after August 17, 2007 up until December 31, 2007, and IPC paid QRS for the use of those workers. *Affidavit of Counsel in Support of Idaho Power Company's Response to Plaintiff's Motion for Summary Judgment*, Exh. C (Docket No. 47-5).

## II. PROCEDURAL HISTORY

On April 1, 2008, QRS commenced the instant action by filing a Complaint. *Complaint and Demand for Jury Trial* (Docket No. 1). QRS's motion to file an amended Complaint was granted, and QRS filed its amended Complaint on March 20, 2009. *First Amended Complaint and Demand for Jury Trial* (Docket No. 38). QRS's amended Complaint alleges three causes of action: (1) tortious interference with employment relationship/contract (Count I); (2) breach of contract, including breach of the implied covenant of good faith and fair dealing (Count II); and (3) tortious interference with prospective economic advantage (Count III). *Id.* On May 29, 2009, QRS moved for summary judgment as to Counts II and III, *[Plaintiff's] Motion for Summary Judgment* (Docket No. 41), and IPC moved for summary judgment as to all counts, *Idaho Power Company's Motion for Summary Judgment* (Docket No. 42).

## II. STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is "material" if it "affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982). When parties file cross-motions for summary judgment, the Court still must determine whether disputed issues of material fact are present. *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). In determining whether summary judgment is appropriate, the record is to be construed in the light most favorable to the non-moving party. *Bernstein v. Aetna Life & Cas.*, 843 F.2d 359, 362 (9th Cir. 1988).

## IV. ANALYSIS

### A. Count I: Tortious Interference with Employment Relationship/Contract

Idaho law does not recognize a claim for tortious interference with contractual relations where the plaintiff alleges contractual interference with at-will employees. *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 286, 824 P.2d 841, 861 (1991). Instead, the proper cause of action is tortious interference with prospective economic advantage. *Id.*

Here, QRS admits that the QRS workers placed at IPC were at-will employees. *First Amended Complaint and Demand for Jury Trial*, ¶ 51 (Docket No. 38); *see also Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 20 (Docket No. 41-2). Therefore, QRS has no cause of action for the tort of interference with contract.

### B. Count II: Breach of Contract and Covenant of Good Faith and Fair Dealing

A breach of contract claim is a question of law, *Angle v. United States*, 709 F.2d 570, 576 (9th Cir. 1983), and is, thus, appropriate for resolution at the summary judgment stage if there are no genuine issues as to any material facts relating to that claim. Initially, this Court must determine the legal effect of the parties' written contract.

The interpretation of a contract begins with the language of the contract itself. If the language of the contract is unambiguous, then its meaning and legal effect must be determined from its words. A contract is ambiguous if it is reasonably subject to conflicting interpretations. Determining whether a contract is ambiguous is a question of law over which this Court exercises free review.

*Cristo Viene Pentecostal Church v. Paz*, 144 Idaho 304, 308, 160 P.3d 743, 747 (2007) (internal quotation marks and citations omitted).

An options contract is "the grant of a right without any obligation." *Ford v. Lord*, 99 Idaho 580, 583, 586 P.2d 270, 273 (1978). The optionee is the party who has the right to exercise the option, but is not bound to do so. *See Sutheimer v. Stoltenberg*, 127 Idaho 81, 85, 896 P.2d 989, 993 (1995). Unless the optionee gives valuable consideration to the optionor to hold the option open, the option is revocable by the optionor. *See id.* "If the optionee exercises the option within the specified time, and thereby accepts the offer," an enforceable bilateral contract is formed. *Id.*

Here, although the Contract was not expressly labeled as an options contract, the unambiguous and undisputed terms of the Contract indicate that it was a revocable options contract in which IPC was the optionee. Pursuant to Article 1 and Exhibit A of the Contract, QRS was obligated to "assign its employees to [IPC] in order to perform the Work described in Exhibit A" "on an as-needed basis," and to "recruit, interview, select and hire applicants who . . . are best qualified to perform the type of Work described in Exhibit A." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Art. 1 and Exhibit A (Docket No. 42-5). In contrast, IPC's only obligation under the Contract was "to pay [QRS] at the rate(s) set forth in Exhibit A" if and when IPC hired QRS workers. *Id.* at Art. 5. No term of the Contract obligated IPC to hire QRS workers or to even consider hiring QRS workers. *See id.*

Because the Contract granted IPC the right to hire QRS without any obligation that it do so, the Contract was an options contract in which IPC was the optionee. Moreover, because IPC did not give valuable consideration to QRS to hold open the option of hiring QRS workers, the Contract was revocable by QRS until IPC accepted the offer. When IPC accepted QRS's offer by hiring QRS workers within the time frame specified in the Contract, the Contract became an enforceable bilateral contract. Once QRS workers' assignments at IPC ended or the workers were terminated, the Contract reverted back to being an outstanding offer that provided IPC the option of hiring QRS workers.

### 1. IPC did not breach the express terms of the Contract.

In its amended Complaint, QRS alleges two ways in which IPC breached the Contract. *See First Amended Complaint and Demand for Jury Trial*, ¶¶ 44–45 (Docket No. 38). First, QRS contends that IPC breached Article 17 of the Contract by failing to provide written notice that IPC was terminating the Contract. *First Amended Complaint and Demand for Jury Trial*, ¶ 45 (Docket No. 38); *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 17 (Docket No. 41-2); *Revised Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment*, p. 3 (Docket No. 56). Article 17 of the Contract provided that IPC "may, at its option, terminate this Agreement in whole or in part any time by written notice thereof to [QRS] . . . ." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Art. 17 (Docket No. 42-5).

IPC was not required to provide written notice of contract termination because IPC never terminated the Contract. Between May 23, 2007, the date IPC selected Spherion to be IPC's primary supplier of temporary labor, and December 31, 2007, IPC continuously hired QRS workers. *Affidavit of Counsel in Support of Idaho Power Company's Response to Plaintiff's*

*Motion for Summary Judgment*, Exh. C (Docket No. 47-5). Accordingly, IPC had exercised its option; an enforceable bilateral contract existed between QRS and IPC; and the Contract had not been terminated. After December 31, 2007, when all QRS workers at IPC had been dismissed, the Contract reverted back to being an outstanding offer that provided IPC the option of hiring QRS workers. IPC's option to hire QRS workers continued until July 19, 2009—the termination date of the Contract, as provided in Article 4. IPC's non-use of QRS workers between January 1, 2008 and July 19, 2009 neither breached nor terminated the Contract because IPC was not obligated under the Contract to hire QRS workers. Thus, IPC did not breach Article 17 of the Contract because IPC never terminated the Contract.

Second, QRS contends that "IPC breached the Contract by refusing to hire QRS workers even when IPC determined that it needed the specialized workers that QRS provided." *Revised Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment*, pp. 3–4 (Docket No. 56); *see also Memorandum in Response to Defendant's Motion for Summary Judgment*, pp. 7–8 (Docket No. 45); *First Amended Complaint and Demand for Jury Trial*, ¶ 44 (Docket No. 38). QRS maintains that "the record . . . is undisputed that in fact IPC did need QRS workers and in fact employed QRS workers albeit through Spherion." *Revised Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment*, p. 5 (Docket No. 56). Exhibit A to the Contract provided that QRS "shall provide [IPC], on an as-needed basis, with" temporary workers. *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Exh. A (Docket No. 42-5).

QRS is attempting to construe the "as-needed" language in Exhibit A as requiring IPC to hire QRS workers if IPC needs more workers. However, as explained above, the Contract was a revocable options contract in which IPC was the optionee and, thus, had no obligation to ever

hire QRS workers. Accordingly, IPC did not breach Exhibit A to the Contract because the Contract was non-exclusive and did not require IPC to hire QRS workers, even if IPC "needed" those workers.

In its briefs to this Court regarding both QRS's Motion for Summary Judgment and IPC's Motion for Summary Judgment, QRS raises new grounds for its breach of contract claim that were not part of QRS's amended Complaint. "Federal Rule of Civil Procedure 8(a)(2) requires that allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (internal quotation marks and citation omitted). The new grounds upon which QRS seeks to base its breach of contract claim are distinct from the grounds stated in QRS's amended Complaint. Considering QRS's new theories at this point would effectively amend the Complaint after the close of discovery and initiation of summary judgment proceedings. Accordingly, this Court finds that QRS's amended Complaint did not provide IPC with fair notice and will not consider QRS's new theories. *See id.* at 968–969; *id.* at 969 (holding that the district court did not err in finding that the plaintiff failed to provide adequate notice of new allegations where the plaintiff's complaint gave the defendants "no notice of the specific factual allegations presented for the first time in [the plaintiff's] opposition to summary judgment"); *Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 943 (9th Cir. 2007) (finding that the district court properly granted the defendant's motion for summary judgment where the plaintiff failed to raise a claim in its complaint); *Rothman v. Dist. Dir. of IRS.*, 483 F.2d 1079, 1081 (9th Cir. 1973) (finding that the trial court was correct in refusing to consider an issue that was never raised until the plaintiff filed his brief in support of his motion for summary judgment); *but see United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1524 (9th Cir. 1995)

("[W]hen a party raises a claim in materials filed in opposition to a motion for summary judgment, the district court should treat the filing as a request to amend the pleadings and should consider whether the evidence presented creates a triable issue of material fact."), *vacated on other grounds*, 520 U.S. 939 (1997); *Apache Survival Coalition v. United States*, 21 F.3d 895, 910–11 (9th Cir. 1994) (same).

Even if this Court were to consider QRS's new theories, it would find no merit in them. In its first new theory, QRS contends that IPC breached Article 1 and Exhibit A of the Contract in May 2007 when "IPC decided to consolidate its temporary staffing needs with Spherion" because the Contract required IPC to "hold open the option of hiring QRS work[ers]," *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 18 (Docket No. 41-2), or "at least consider QRS as an optional source of qualified temporary workers," *Memorandum in Response to Defendant's Motion for Summary Judgment*, p. 7 (Docket No. 45). *See also Revised Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment*, pp. 3–5 (Docket No. 56). The plain language of Article 1 and Exhibit A did not impose either of those obligations on IPC. *See Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Art. 1 and Exh. A (Docket No. 42-5). To the Contrary, Article 1 and Exhibit A imposed obligations on QRS—they required QRS to "assign its employees to [IPC]" "on an as-needed basis" and to "recruit, interview, select and hire applicants who . . . are best qualified to perform the type of Work described in Exhibit A." *Id.* Additionally, because IPC was the optionee and not the optionor, IPC was not required to hold open any option. Accordingly, IPC did not breach Article 1 or Exhibit A of the Contract.

In its second new theory, QRS contends that "IPC breached the terms of the Contract vesting in QRS control of its own employees [(Articles 1, 2, and 3)] when IPC failed to notify

QRS in writing under Article 16 that IPC was consolidating its temporary staff needs and that it would be dismissing QRS employees." *Revised Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment*, p. 5 (Docket No. 56); *see also Memorandum in Response to Defendant's Motion for Summary Judgment*, p. 9 (Docket No. 45). Article 16 provided that "[a]ny notices to be given under this Agreement shall occur in writing . . . ." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Art. 16 (Docket No. 42-5). No term of the Contract required IPC to notify QRS of IPC's plans to consolidate its temporary staffing needs. *See id.* Similarly, although Article 1(7) required QRS to remove any of its employees at IPC's request, no term of the Contract required IPC to notify QRS that IPC would be dismissing QRS employees. *See id.* Because the Contract did not require that IPC give such notices to QRS, the requirements of Article 16 did not apply to these notices. Therefore, IPC did not breach Articles 1, 2, 3, or 16 of the Contract.

Finally, in its third new theory, QRS contends that IPC breached Articles 1(7), 2, and 3 of the Contract "when [IPC] directly contacted QRS employees and offered them the possibility of further employment if they joined a competitor of QRS." *Revised Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment*, pp. 5–6 (Docket No. 56); *see also Memorandum in Response to Defendant's Motion for Summary Judgment*, pp. 9–10 (Docket No. 45). QRS maintains that Article 1(7) stated that "IPC must contact QRS, not QRS's employees, if IPC wants to remove QRS workers." *Memorandum in Response to Defendant's Motion for Summary Judgment*, p. 9 (Docket No. 45). In fact, Article 1(7) stated, in pertinent part, that QRS will "at the request of [IPC] for any valid legal reason, remove any of its employees assigned to [IPC] . . . ." *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Art. 1(7) (Docket No. 42-5). Accordingly, the plain language of Article

1(7) imposed a requirement on QRS, but it did not prohibit IPC from directly contacting QRS workers or require IPC to contact QRS instead of QRS workers regarding their employment or termination. Moreover, no term of the Contract prohibited IPC from offering QRS workers the possibility of further employment if the workers joined a competitor of QRS. *See id.* In fact, Article 3 provided that "[IPC] retains the right to hire its own employees directly or without payment or obligation to [QRS]." *See id.* at Art. 3. Thus, under the express terms of the Contract, IPC had the right to offer QRS workers employment with IPC. Consequently, IPC did not breach Articles 1(7), 2, or 3 of the Contract.

### 2. IPC did not breach the implied covenant of good faith and fair dealing.

The covenant of good faith and fair dealing is implied by law in every contract. *Bliss Valley Foods, Inc.*, 121 Idaho at 287–88, 824 P.2d at 862–63. "The covenant requires that the parties perform in good faith the obligations imposed by their agreement." *Id.* at 288, 863 (internal quotation marks and citation omitted). The covenant is violated "only when either party violates, nullifies, or significantly impairs any benefit of the contract." *Id.* (internal quotation marks, ellipses, and citations omitted). "No covenant will be implied which is contrary to the terms of the contract negotiated and executed by the parties." *Id.*

Here, IPC's only obligation under the Contract was "to pay [QRS] at the rate(s) set forth in Exhibit A" if and when IPC hired QRS workers. *Affidavit of Counsel in Support of Idaho Power Company's Motion for Summary Judgment*, Exh. B at Art. 5 (Docket No. 42-5). QRS does not allege that IPC failed to make any such payments or failed to make such payments in good faith.

The transition of QRS workers to Spherion may be construed as significantly impairing a benefit of the Contract because, once former QRS workers transitioned to Spherion, QRS would

no longer receive compensation from IPC for those workers.  However, as explained above, the

Contract did not prohibit the transition of workers from QRS to Spherion, and the covenant of

good faith and fair dealing cannot be implied contrary to the negotiated terms of the Contract.

Accordingly, IPC performed its contractual obligations in good faith, and it did not violate,

nullify, or significantly impair any benefit of the Contract in a way that was contrary to the

negotiated terms of the Contract.  Thus, IPC did not breach the implied covenant of good faith

and fair dealing.

QRS contends that IPC breached the implied covenant of good faith and fair dealing in

three ways.  First, QRS contends that IPC breached the implied covenant of good faith and fair

dealing by "[w]rongfully and deceptively obtaining confidential proprietary information [from]

QRS by wrongful and deceptive means."  *First Amended Complaint and Demand for Jury Trial*,

¶ 47(a) (Docket No. 38).  QRS failed to argue this specific issue in its written submissions to the

Court, but IPC assumes that the above contention refers to the information IPC collected through

its RFI, *Memorandum in Support of Idaho Power Company's Motion for Summary Judgment*,

pp. 8–9 (Docket No. 42-1), and QRS does not argue to the contrary, *See Memorandum in*

*Response to Defendant's Motion for Summary Judgment* (Docket No. 45); *see also*

*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 2 (Docket No. 41-2)

(stating that IPC made false guarantees in the RFI).  Assuming that QRS's contention refers to

the RFI, QRS's contention that the RFI breached the implied covenant of good faith and fair

dealing lacks merit.  The RFI was not part of the Contract, nor was it incorporated into the

Contract.  Thus, the RFI did not create any additional obligations related to the Contract.

Because the implied covenant only requires that IPC perform in good faith the obligations

imposed by the Contract, IPC did not breach the implied covenant of good faith and fair dealing by obtaining information from QRS through the use of an RFI.

Second, QRS contends that IPC breached the implied covenant of good faith and fair dealing by "[w]rongfully and deceptively contacting QRS's employees working at IPC and recruiting them to become employees of Spherion on pain of not otherwise working for IPC." *First Amended Complaint and Demand for Jury Trial*, ¶ 47(b) (Docket No. 38); *see also Memorandum in Support of Plaintiff's Motion for Summary Judgment*, pp. 18–19 (Docket No. 41-2) (arguing that IPC compromised QRS's control and right to control its workers at IPC); *Memorandum in Response to Defendant's Motion for Summary Judgment*, p. 8 (Docket No. 45) (same). IPC did not wrongfully contact QRS employees because, as explained above, the Contract did not prohibit IPC from directly contacting QRS workers regarding their employment or termination, nor did the Contract prohibit IPC from offering QRS workers the possibility of further employment if the workers joined Spherion. Moreover, IPC did not contact QRS workers in a deceptive manner. QRS workers received the same memorandum regarding IPC's consolidation, dated June 14, 2007, as did all temporary workers who were placed at IPC. The Memorandum followed the transition procedure set out in the American Staffing Association's (ASA) code of ethics—it gave temporary workers "the choice of accepting an assignment with another client of the outgoing firm . . . or applying to stay in their current assignment with the new staffing firm." *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 24 (Docket No. 41-2) (quoting the ASA code of ethics). Accordingly, IPC's contact with and recruitment of QRS workers did not violate the implied covenant of good faith and fair dealing.

Third, QRS contends that IPC breached the implied covenant of good faith and fair dealing by "repudiating or otherwise breaching the contract without giving notice to QRS that

IPC would no longer maintain the ability or option of using QRS's employees even when IPC had need of such workers." *First Amended Complaint and Demand for Jury Trial*, ¶ 48 (Docket No. 38); *see also Memorandum in Response to Defendant's Motion for Summary Judgment*, p. 8 (Docket No. 45). As explained above, IPC never repudiated or breached the Contract, and IPC, as the optionee, was not obligated under the Contract to hold open the option of hiring QRS workers. Thus, IPC's conduct did not breach the implied covenant of good faith and fair dealing.

### C. Count III: Tortious Interference with Prospective Economic Advantage

In order to establish a prima facie case for the tort of interference with prospective economic advantage, a plaintiff must show,

> (1) [t]he existence of a valid economic expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) intentional interference inducing termination of the expectancy; (4) the interference was wrongful by some measure beyond the fact of the interference itself[;] and (5) resulting damage to the plaintiff whose expectancy has been disrupted.

*Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 145 Idaho 208, 217, 177 P.3d 955, 964 (2008) (internal quotation marks and citation omitted). A plaintiff may show that the intentional interference was wrongful "by proof that either: (1) the defendant had an improper objective or purpose to harm the plaintiff; or (2) the defendant used a wrongful means to cause injury to the prospective business relationship." *Bliss Valley Foods, Inc.*, 121 Idaho at 286, 824 P.2d at 861. Wrongful means include conduct in violation of: (1) a statute or other regulation; (2) "a recognized rule of common law, such as violence, threats of other intimidation, deceit[,] misrepresentation, bribery, or disparaging falsehood," *id.* at 286 n.16, 861 n.16 (internal quotation marks, ellipses, and citation omitted); or (3) "an established standard of trade or profession," *id.* at 285, 860 (internal quotation marks and citation omitted).

Here, QRS had a valid economic expectancy arising from its placement of at least ten QRS workers at IPC pursuant to the Contract—Article 5 and Exhibit A of the Contract obligated IPC to pay QRS at the specified rates for IPC's use of those QRS workers. IPC knew about QRS's economic expectancy because IPC was a party to the Contract. IPC's decision to transition to Spherion and the resulting Memorandum sent out by IPC on June 14, 2007 to all temporary workers, including QRS workers, constituted intentional interference with QRS's economic expectancy, and it induced the partial termination of that expectancy—but for IPC's transition to Spherion and the resulting Memorandum, the QRS workers placed at IPC most likely would have continued their assignments at IPC as employees of QRS, and QRS would have received compensation from IPC for the use of those workers. However, QRS's economic expectancy was terminated as to six former QRS employees when those workers, induced by the Memorandum, became employees of Spherion. *See, e.g.*, *Affidavit of David J. Rogers*, ¶ 7 (Docket No. 41-4) ("That as a result of this declaration by Idaho Power Company, I (did) quit working for Quality Resource & Service, Inc. and begin employment with Spherion."). QRS, thus, has established the first three elements of tortious interference with prospective economic advantage. QRS, however, cannot establish the fourth element of this tort—that the interference was wrongful by some measure beyond the fact of the interference itself—because IPC did not use a wrongful means, nor did it have an improper purpose, when it interfered with QRS's economic expectancy.

### 1. IPC's interference was not accomplished by wrongful means.

First, QRS contends that "IPC wrongfully forced and caused the 'transfer' of QRS's temporary workers from QRS to Spherion by sending out the [June 14], 2007, notice to QRS's workers at IPC . . . ." *First Amended Complaint and Demand for Jury Trial*, ¶ 58 (Docket No.

38).  As explained above, the Contract did not prohibit IPC from directly contacting QRS

workers regarding their employment and termination, nor did it prohibit IPC from offering QRS

workers the possibility of further employment if the workers joined a competitor of QRS.  Thus,

IPC's June 14, 2007 Memorandum was not a wrongful mean of interfering with QRS's

economic expectancy.

Second, QRS contends that IPC's interference was accomplished by wrongful means

because IPC did not notify QRS that IPC "would be sending out such notice or that IPC had in

fact breached the Contract with QRS."  *First Amended Complaint and Demand for Jury Trial*, ¶

59 (Docket No. 38).  As explained above, the Contract did not require IPC to first notify QRS

that it would be sending out the Memorandum.  Moreover, as explained above, IPC did not

breach the Contract.  Accordingly, these claims by QRS do not support a finding that IPC used

wrongful means to interfere with QRS's economic expectancy.

Third, QRS contends that IPC's interference was accomplished by wrongful means

because the Memorandum "forc[ed] . . . QRS's employees to quit QRS and join . . . Spherion."

*First Amended Complaint and Demand for Jury Trial*, ¶ 53 (Docket No. 38).  As explained

above, the Memorandum presented QRS workers with two options: either "[c]ontinue with your

existing employer assigned to service another client," or "[a]pply with Spherion for

consideration at IPC."  *Affidavit of Counsel in Support of Idaho Power Company's Motion for

Summary Judgment*, Exh. G (Docket No. 42-10).  Because QRS workers were given these

options, any ensuing employment relationships with Spherion resulted from the workers'

personal decisions; the workers were not "forced" to join Spherion.  Additionally, the only

affidavit QRS submitted from a former worker who joined Spherion, David J. Rogers, does not

assert that his decision to join Spherion resulted from threats, intimidation, deceit,

misrepresentation, bribery, or disparaging falsehood—it simply states that "as a result of [the Memorandum] by Idaho Power Company, I (did) quit working for Quality Resource & Service, Inc. and begin employment with Spherion." *Affidavit of David J. Rogers*, ¶ 7 (Docket No. 41-4). Thus, no evidence supports QRS's claim that the Memorandum wrongfully forced QRS workers to join Spherion.

Fourth, QRS contends that IPC's interference was accomplished by wrongful means because the RFI falsely stated that it "would have no impact on vendors' employees or their assignments at IPC." *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 23 (Docket No. 41-2). Here, the interference with QRS's economic expectancy resulted from IPC's issuance of the Memorandum, not the RFI. Moreover, because the RFI was distributed to QRS directly and not to its individual workers, there is no evidence that statements included in the RFI induced QRS workers to leave QRS and join Spherion. Thus, this argument does not support a finding that IPC used wrongful means to interfere with QRS's economic expectancy.

Finally, QRS contends that IPC's interference was accomplished by wrongful means because IPC "violated the American Staffing Association's code of ethics." *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 24 (Docket No. 41-2). In support of this argument, QRS quotes the following excerpt from the ASA code of ethics:

> To observe the following guidelines to ensure an orderly transition when taking over an account being serviced by another staffing firm:
>
> - The outgoing firm and its employees should, whenever feasible, be given reasonable prior notice that the account is being transferred.
>
> - Assigned employees of the outgoing firm should, whenever feasible, be allowed to continue working on the payroll of the outgoing firm for some reasonable transition period; thereafter, they should be given the choice of accepting an

assignment with another client of the outgoing firm if one
is available, or applying to stay in their current assignment
with the new staffing firm.

*Id.* (quoting the ASA code of ethics). QRS maintains that "IPC's actions were unethical"
because "QRS was never notified that IPC had consolidated its temporary staffing needs with
Spherion or that QRS employees were being transitioned to Spherion." *Id.* QRS also maintains
that the ASA code of ethics "state that the employers and employees should be informed at least
simultaneously" of such a transition. *Revised Reply to Defendant's Response to Plaintiff's
Motion for Summary Judgment*, p. 9 (Docket No. 56). The court disagrees.

First, QRS reads a requirement into the ASA code of ethics that simply does not
exist—the code of ethics does not require that employers and employees receive simultaneous
notification regarding account transfers; it is silent on that issue. Second, QRS's statement that it
never received notification of IPC's consolidation plans is false because QRS received such
notification on or about June 21, 2007 when a QRS worker contacted QRS about the
Memorandum; and, in late June 2007, IPC affirmatively informed QRS that QRS workers would
be dismissed on August 17, 2007 unless they joined Spherion. *Statement of David Ingram*, p. 3
(Docket No. 41-3). Finally, IPC abided by the ASA code of ethics by giving its temporary
workers the option of either continuing with their current employers or applying with Spherion
in order to stay in their current assignments. Accordingly, IPC's compliance with the ASA code
of ethics demonstrates that IPC's interference with QRS's economic expectancy did not violate
an established standard of trade or profession.

**2. IPC's interference was not for an improper purpose.**

IPC claims that the purpose of the Memorandum was to "provid[e] the temporary
workers a generic notice that Idaho Power had consolidated its temporary services vendors and

giv[e] them the option of either continuing their employment with their current employer or applying to Idaho Power's new temporary services provider." *Memorandum in Support of Idaho Power Company's Motion for Summary Judgment*, p. 14 (Docket No. 42-1). An additional, but closely related, purpose—inducing some temporary workers to leave their current employers and transfer to a competitor, Spherion—can be inferred from an e-mail sent by Denali employee Alpar Kamber to IPC employee Angelique Keavney on May 31, 2007. In that e-mail, Mr. Kamber wrote, "Should we pull in the date for the open houses? Since timing is critical in co[n]verting these staff to Spherion we should be acting faster than the incumbent suppliers to find other opportunities for them. Therefore the sooner Spherion can get in front of them the better." *Declaration of John L. Runft in Support of Plaintiff's Motion for Summary Judgment*, Exh. G (Docket No. 41-5, SEALED). QRS contends that IPC's purpose of inducing workers to join a competitor was improper. *First Amended Complaint and Demand for Jury Trial*, ¶¶ 51, 53, 55, 58 (Docket No. 38).

Inducing at-will employees to leave their current employer and transfer to a competitor is not an improper purpose if certain requirements are met.

> One who intentionally causes a third person . . . not to continue an existing contract terminable at will does not improperly interfere with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other[,] (b) the actor does not employ wrongful means[,] (c) his action does not create or continue an unlawful restraint on trade[,] and (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768 (1979) (hereinafter *Second Restatement*), *adopted by Frantz v. Parke*, 111 Idaho 1005, 1012, 729 P.2d 1068, 1075 (1986).[1] Here, for purposes of

---

[1] As recognized in *Highland Enterprises, Inc. v. Barker*,

determining whether IPC's purpose was proper, IPC can be considered a competitor of QRS because IPC, in distributing the Memorandum, acted on behalf of Spherion, one of QRS's direct competitors.

The first requirement—that the relation must concern a matter involved in the competition between the actor and the other—applies where the "business diverted from the competitor relates to the competition between [the competitor] and the actor." *Second Restatement*, at cmt. d. Here, the business diverted from QRS was the employment of six temporary workers. The competition between QRS and IPC was the employment of those six temporary workers. Thus, the business diverted from QRS related to the competition between QRS and IPC, and IPC has satisfied the first requirement.

IPC has also satisfied the remaining requirements. IPC has satisfied the second requirement—that the actor must not employ wrongful means—because, as explained above, IPC's interference was not accomplished by wrongful means. IPC has satisfied the third requirement—that the actor's action must not create or continue an unlawful restraint on

---

> [w]hen addressing the various elements of intentional interference with a prospective economic advantage, it is important to note that the torts of intentional interference with a prospective economic advantage and intentional interference with contract are very similar, differing only in the type of economic relationship with which the defendant has interfered. . . . Accordingly, cases and commentary addressing the two torts often apply interchangeably the standards for proving the common elements. The RESTATEMENT (SECOND) OF TORTS also makes clear that the actions are nearly identical.

*Highland Enters., Inc. v. Barker*, 133 Idaho 330, 339 n.3, 986 P.2d 996, 1005 n.3 (1999). Because the "prospective economic advantage" interfered with in this case is the at-will employment contracts between QRS and its employees, it is appropriate to refer to section 768 of the *Second Restatement*. Section 768 provides guidance as to when competition can be considered an improper purpose in interfering with others' at-will contractual relationships.

trade—because there is no evidence to support an allegation, nor does QRS allege, that IPC's inducement of QRS's workers to join a competitor of QRS created or continued an unlawful restraint on trade.  Finally, IPC has satisfied the fourth requirement—that the actor's purpose must be, at least in part, to advance his interest in competing with the other—because IPC's purpose, inducing QRS workers to join Spherion, was to advance IPC's interests in competing with QRS.  Accordingly, IPC's purpose of inducing QRS's at-will employees to leave QRS and transfer to a competitor, Spherion, was not improper.[2]

## V.  CONCLUSION

Count I is not a cognizable cause of action under Idaho law, which governs the contract at issue in this case, because QRS alleges contractual interference with at-will employees.  Summary judgment will thus be granted in IPC's favor on Count I.

As to Counts II and III—breach of contract and the implied covenant of good faith and fair dealing, and tortious interference with prospective economic advantage, respectively—the

---

[2] Although the Ninth Circuit has not addressed this issue, the court's conclusion is also supported by case law from other circuits, which have held that

> [t]he mere fact that a competitor or someone acting in his behalf induces an employee to leave his employer and to become employed by his competitor has generally been held, in itself, not to make the competitor or the person acting in his behalf liable in any way to the employer, where the employee was not engaged for a definite term.

S.R. Shapiro, Annotation, *Liability for Inducing Employee Not Engaged for Definite Term to Move to Competitor*, 24 A.L.R.3d 821, § 3 (1969) (citing *Triangle Film Corp. v. Artcraft Pictures Corp.*, 250 F. 981 (2d Cir. 1918) and *Harley & Lund Corp. v. Murray Rubber Co.*, 31 F.2d 932 (2d Cir. 1929)); *see also Constr. Mgmt. and Inspection, Inc. v. Caprock Commc'ns Corp.*, 301 F.3d 939, 942 (8th Cir. 2002) ("Caprock's statement to the CMI inspectors that new firms had been awarded the inspection contracts was likewise not improper. Caprock merely informed the CMI employees of the status of Caprock's relationship with CMI. Employees were accurately advised that if they wanted to continue to work on the Caprock projects, they would have to seek employment with the new inspection firms.").

Court finds there are no genuine issues of material fact and that IPC is entitled to judgment as a matter of law. Summary judgment will thus be granted in IPC's favor on Counts II and III.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)      QRS's Motion for Summary Judgment (Docket No. 41), filed May 29, 2009, is **DENIED**;

2)      IPC's Cross-Motion for Summary Judgement (Docket No. 42), filed May 29, 2009, is **GRANTED**.

DATED:  **February 23, 2010**

Honorable Edward J. Lodge
U. S. District Judge